UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN RODRIGUEZ,<br><br>                                    Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>                                    Defendant. | Case No.: 19-CV-2373-WVG<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**[Doc. Nos. 13, 16.]** |

This is an action for judicial review of a decision by the Commissioner of Social Security, Andrew Saul, denying Plaintiff Juan Rodriguez supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act") and Social Security Disability Insurance under Title II of the Act. The parties have filed cross-motions for summary judgment. For the reasons stated below, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

/ / /

/ / /

/ / /

/ / /

## I.   OVERVIEW OF SOCIAL SECURITY CLAIM PROCEEDINGS

Pursuant to the Social Security Act, the Social Security Administration ("SSA") administers the SSI program. 42 U.S.C. § 901. The Act authorizes the SSA to create a system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.* Defendant, as Acting Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

### A.   The SSA's Sequential Five-Step Process

The SSA employs a sequential five-step evaluation to determine whether a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520. To qualify for disability benefits under the Act, a claimant must establish (1) he or she suffers from a medically-determinable impairment[1] which can be expected to result in death or has lasted or can be expected to last for a continuous period of twelve months or more and (2) the impairment renders the claimant incapable of performing the work he or she previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

A claimant must meet both requirements to qualify as "disabled" under the Act, *id.* § 423(d)(1)(A), (2)(A), and bears the burden of proving he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired. *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An administrative law judge ("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (summarizing the five-step process). If the Commissioner finds a claimant is

---

[1] A medically-determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

disabled or not disabled at any step in this process, the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to establish whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

An ALJ will deny a claimant's disability claim if the ALJ does not find a claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

However, if the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments which the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. *Id.* § 404.1520(d).

Before formally proceeding to step four, the ALJ must establish the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In establishing a claimant's RFC, the ALJ must consider relevant evidence as well as the claimant's

collection of impairments, including those categorized as non-severe. *Id.* § 404.1545(a)(3), (e). If an ALJ does not conclusively determine a claimant's impairment or combination of impairments is disabling at step three, the evaluation advances to step four.

At step four, the ALJ uses the claimant's RFC to determine whether the claimant can perform the requirements of his or her past relevant work. *Id.* § 404.1520(f). So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* § 404.1560(b)(3). Conversely, if the claimant either cannot perform or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do any other work considering his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant can do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform—allowing for his RFC, age, education, and work experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

**B.    SSA Hearings and Appeals Process**

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See id.* §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request

review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court. *See id.* §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either decide the matter or refer it to another ALJ. *Id.* § 404.983.

## II.   BACKGROUND

### A.   Procedural History

Plaintiff is a 54-year-old male who alleges he is too disabled to work. (AR 122.) On December 18, 2009, Plaintiff filed his initial application for disability and disability insurance benefits, alleging disability beginning September 12, 2007. (AR 92.) ALJ Howard Treblin issued a decision, granting Plaintiff disability beginning on September 12, 2007 and ending on January 13, 2010. (AR 95-103.) On April 5, 2012, Plaintiff filed a second Title II application, alleging disability through March 31, 2015, the last date insured.[2] (AR 29.) Plaintiff filed Title II and Title XVI claims in January 2017, and the

---

[2] The second claim thus covers the claimed disability period from January 14, 2010 to March 31, 2015.

Appeals Council consolidated the claims. (AR 849.)

Plaintiff's 2012 claim was initially denied, and on July 5, 2015, Plaintiff requested a hearing for reconsideration. (AR 156-57.) On February 17, 2015, a hearing was held before ALJ Treblin. (AR 59-86.) The ALJ issued a decision denying Plaintiff's claim for benefits on April 30, 2015. (AR 26-43.) On September 20, 2016, the Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner. (AR 1-7.) On November 15, 2016, Plaintiff filed a complaint in district court, seeking review of the ALJ's decision. (AR 922-25.) On August 11, 2017, District Judge Cathy Ann Bencivengo issued an order granting Plaintiff's motion for summary judgment and remanded the case for further proceedings and additional explanation. (AR 947-37.) On July 8, 2019, a second hearing was held before ALJ Treblin. (AR 971-94.) On remand, the ALJ again issued an unfavorable decision on September 5, 2019. (AR 843-61.) Plaintiff now seeks judicial review of the ALJ's 2019 decision.

**B.    Medical Overview**

Plaintiff's medical records contain documents relating to impairments in his left knee, right knee, lower back, and right hip. However, Plaintiff's disability application is limited only to his left knee and lower back. (AR 254.)

Plaintiff's complaints regarding his left knee arose out of a 2007 work-related injury. (AR 444.) On November 14, 2007, Plaintiff was diagnosed with a medial meniscus tear and underwent his first arthroscopy with chondroplasty[3] on his left knee. (AR 420.) Plaintiff's second arthroscopy with chondroplasty on his left knee occurred on December 10, 2009. (AR 442-43.) After his second surgery, Plaintiff continued to complain of pain in his left knee, right hip, right knee, and lower back. (AR 488, 534, 567-68, 611.) Medical imaging showed chondromalacia and medial femoral condyle with early degenerative

---

[3] An arthroscopic chondroplasty is a minimally invasive surgery that uses a small camera and instruments to clean and smooth damaged cartilage in the knee. *Antroscopic Chondroplasty*, FL. ORTHO. INST., https://www.floridaortho.com/specialties/knee-leg/arthroscopic-chondroplasty/ (last visited March 2, 2021).

changes of the left knee, status post left knee arthroscopies, mild thoracic spondylosis with mild levoscoliosis, lumbar degenerative disc disease, with mild facet arthritis at L5-S1, trochanteric bursitis and degenerative changes of the right hip, and degenerative changes of the right knee. (AR 649.)

In January 2010, Plaintiff visited his treating physician, Thomas Harris, MD, complaining of pain in his left knee, depending on the activity. (AR 444.) The examination revealed tenderness to palpation and weakness with knee flexion and extension. (*Id.*) Dr. Harris's treatment plan included physical therapy and medication. (AR 445.)

In March 2010, Paul Murphy, MD, completed an Agreed Medical Examiner's Re-examination Report. (AR 464.) Plaintiff complained the pain in his left knee was constant, and on a scale from 0 to 10, the pain in his left knee was a 5 to 6 or higher. (AR 466.) Plaintiff also complained of pain in his right knee, although the pain was less severe and more intermittent. (*Id.*) Plaintiff reported he could not stand nor walk for more than fifteen to twenty minutes and could not lift more than a case of water. (*Id.*) He stated it was hard for him to help with housework, but he could do dishes, help with the laundry and cooking, make the beds, and go grocery shopping. (AR 467.) Medical imaging of his left knee revealed normal overall bony alignment, no fracture or dislocation, and joint spaces were well maintained, except at the medial compartment. (AR 468.) The imaging showed moderate degenerative joint disease in the medial compartment of the left knee. (*Id.*) Dr. Murphy characterized Plaintiff's pain as slight to moderate in nature. (AR 474.) Dr. Murphy's objective findings included: (1) tenderness and loss of motion in the left knee; (2) atrophy of the left thigh; and (3) one centimeter atrophy of the left calf. (*Id.*) Regarding disability, Dr. Murphy's report included:

> [T]he patient should be precluded from running, jumping, kneeling, squatting, walking on uneven surfaces, crouching, crawling, pivoting, ladder climbing and working at heights and other activities of comparable physical effort. He should also be precluded from heavy lifting, contemplating 50% loss of pre-injured capacity for lifting.

(AR 474.) Dr. Murphy's plan for future care included anti-inflammatory pain medications and injections. (AR 475.) He did not see a need for further surgery at that time. (*Id.*)

In April 2010, Plaintiff underwent his first consultative examination with Thomas Sabourin, MD. (AR 456.) Plaintiff presented with no assistive device and complained of pain in his right and left knees. (*Id.*) Plaintiff sat and stood with normal posture, was able to sit through the examination comfortably, and was able to rise from the chair without difficulty. (AR 457.) Although Plaintiff walked with a slight limp, favoring his right knee, he exhibited a normal toe to heel walk. (*Id.*) Dr. Sabourin noted there was no instability in the left knee. (AR 458.) Dr. Sabourin's evaluation included:

> The [left] knee actually looks pretty good, but the patient does complain. He appeared he did not want to fully extend the knee, but when he walked, he fully extended it and would allow me to fully extend it passively. There is minimal crepitus in the knee and no redness or warmth. There is minimal effusion. On the opposite knee, he has some mild anterior tenderness over the patella and the patellar tendon, there may be mild tendinitis, but there is nothing significant.

(AR 459.) Dr. Sabourin reported Plaintiff could carry twenty pounds occasionally and ten pounds frequently. (*Id.*) Plaintiff could also stand and walk up to six hours of an eight-hour workday and sit for the same amount of time. (AR 459.) An assistive device was not necessary to ambulate. (*Id.*)

In November 2010, Dr. Murphy completed a second Agreed Medical Examiner's Re-Examination Report. (AR 566.) Plaintiff reported he was experiencing constant pain in his left knee, right knee, and right hip and he could no longer do any sports or go to the movies. (AR 567-68.) Plaintiff characterized his left knee pain as a 6 to 7 on a scale of 0 to 10, his right knee pain as an 8, and his right hip as an 8 or 9. (*Id.*) He reported he could not sweep or mop, and it was difficult for him to do the dishes and laundry. (*Id.*) Plaintiff stated he could not sit for more than twenty to thirty minutes and could not stand or walk for more than ten to fifteen minutes. (*Id.*)

Dr. Murphy reviewed medical imaging of Plaintiff's left knee, right knee, and right hip. (AR 570.) Images of Plaintiff's left knee revealed normal overall bony alignment, no

fracture or dislocation, and medial compartment narrowing. (*Id*.) Medical imaging of Plaintiff's right knee revealed normal overall bony alignment, no fracture or dislocation, and satisfactory joint spaces. (*Id*.) Images of Plaintiff's right hip revealed the same. (*Id*.)

Dr. Murphy concluded Plaintiff had degenerative changes in his left knee and was developing bursitis on his right hip. (AR 574.) He recommended Plaintiff undergo diagnostic studies of his right knee and hip. (*Id*.)

In December 2010, Plaintiff visited his treating physician at the time, Thomas Harris, MD. (AR 578.) Dr. Harris prescribed Plaintiff Hydrocodone and Ibuprofen to treat Plaintiff's pain. (*Id*.) Dr. Harris discussed side effects of the medication and noted Plaintiff denied experiencing any side effects. (*Id*.)

In February 2011, Plaintiff continued to complain of pain in his right knee and hip and providers performed medical imaging. (AR 593-95.) Dr. Harris reviewed these images on March 28, 2011. (AR 589.) Images of Plaintiff's right hip showed a tear of the labrum, partial detachment of the anterior lateral aspect, and mild degenerative changes. (*Id.*) Images of Plaintiff's right knee showed degenerative joint disease. (*Id.*) During the physical examination, Plaintiff walked with a slightly antalgic gait, and Dr. Harris noted tenderness to palpation. (AR 589-90.) Plaintiff exhibited crepitus with motion in his right knee. (AR 590.) Dr. Harris's treatment plan consisted of a series of injections for the right knee and a prescription for Hydrocodone and Ibuprofen. (AR 590.) During this examination, Plaintiff denied any side effects from the medication he was currently taking, which included Hydrocodone and Ibuprofen. (AR 585, 587, 590.)

In July 2012, Dr. Mozzaz examined Plaintiff at the request of the Department of Social Security. (AR 611.) Plaintiff presented with a brace over his left knee and walked with a slightly antalgic gait. (AR 612.) Plaintiff's range of motion of his right hip and right knee were within normal limit, but Plaintiff exhibited a decreased range of motion in his left knee and decreased flexion in his thoracolumbar range of motion. (AR 613.) Motor strength in Plaintiff's lower and upper extremities was 5 out of 5. (AR 614.) Dr. Mozzaz noted tenderness in Plaintiff's left knee but no effusion or crepitus. (AR 613.) Plaintiff's

straight leg test was negative. (AR 615.) Dr. Mozzaz diagnosed Plaintiff with status post left knee arthroscopy with diminished extensions and lumbar degenerative disc disease. (AR 614-15.) Medical imaging revealed levoscoliosis of the lumbar spine and disc narrowing at L5-S1 with facet hypertrophic change. (AR 614.) Dr. Mozzaz reported Plaintiff could carry ten pounds frequently, could stand and walk six hours of an eight-hour workday, and Plaintiff did not require the use of an assistive device to ambulate. (AR 615.)

In September 2012, Jerome Hall, MD, conducted an Orthopedic Evaluation. (AR 635.) Dr. Hall noted there were severe arthritic changes in the medial compartment of Plaintiff's left knee and recommended Plaintiff be fitted with a brace and utilize a cane in his left hand. (AR 637.) Dr. Hall recommended treatment of anti-inflammatory medications and icing on the knee. (*Id.*) Dr. Hall concluded that Plaintiff "eventually may go on and require a total knee replacement. (*Id.*)

In October 2012, Dr. Harris completed a chart note that included:

> The patient would benefit from a partial joint replacement, specifically a unicompartmental. Having normal cartilage in the patellafemoral and lateral compartment, I feel that the patient would benefit from a unicompartmental replacement. He may need a total joint replacement in the future.

(AR 620.)

In June 2013, Dr. Sabourin completed a consultative examination of Plaintiff. (AR 624-29.) The evaluation included:

> This individual comes in today with the severity and duration of his complaints in some disproportion to the determinable condition. He has had surgery on his left knee showing some chondromalacia, which was debrided at the time. He does some have atrophy in the left leg. So, I do feel he is favoring it. He does not display full range of motion, and he may have decreased range of motion, but he did not appear to be fully cooperative during the examination . . . The lumbar spine problems are not as severe as noted in the history when the x-rays were read by a second physician.

(AR 628.) This evaluation also indicated Plaintiff exhibited an exaggerated limp, favoring the left knee, but that no assistive device was needed to ambulate. (AR 625, 628.) Plaintiff had a normal heel and toe walk and could get on and off the examination table, although

Plaintiff complained significantly with any movement. (AR 625.) Dr. Sabourin noted normal strength throughout Plaintiff's upper and lower extremities and normal sensation. (AR 627.) Medical images of Plaintiff's spine showed minimal spondylosis in the thoracic spine with some anterior spurring, but the evaluation did not show any significant decrease in the disk spaces. (*Id.*) The images of Plaintiff's left knee showed minimal changes of decreased joint space and some minimal sclerosis but "with very little in the way of spurring." (AR 628.) Additionally, there appeared to be some joint space remaining in the left knee. (*Id.*)

Dr. Sabourin noted that due to Plaintiff's mild back problem and his left knee problem, Plaintiff could carry or lift twenty pounds occasionally and ten pounds frequently. (AR 628.) Additionally, Plaintiff could stand and walk six hours of an eight-hour workday and sit for the same amount of time. (*Id.*)

A radiology report of Plaintiff's thoracic spine from June 4, 2013 revealed minimal spondylosis at T9 to T12 with no loss of height of vertebral bodies. (AR 630.) A radiology report of the lumbar spine revealed no loss of height of vertebral bodies, minimal spondylosis, and mild disc degeneration at L3-4. (*Id.*) The final radiology report of Plaintiff's left knee showed some small spurs and early osteoarthritis. (*Id.*)

Plaintiff saw Dr. Tucker in May 2014 and reported he was experiencing left knee pain and lower back pain. (AR 700.) However, he reported Ibuprofen offered about 80-90% pain relief. (*Id*.) Medical imaging was performed on Plaintiff's lumbar spine and left knee in May 2014. (AR 713-14.) The radiology report of Plaintiff's spine revealed normal vertebral body heights but minor disc narrowing at L3-L4 and minimal osteophytosis in the spine. (AR 713.) The second radiology report of Plaintiff's left knee showed no evidence of fracture or dislocation and a normal examination. (AR 714.)

In August 2014, Plaintiff reinjured his knee a few days prior to an appointment. (AR 841.) At the appointment, Plaintiff reported continuing pain in his left knee, right knee, and lower back. (*Id.*) He reported locking, clicking, crunching, and a limited range of motion in his left knee. (*Id.*) On a scale of 0 to 10, Plaintiff stated his pain was an 8 at rest and 10

19-CV-2373-WVG

at its worth. (*Id.*) Plaintiff ambulated with an antalgic gait. (AR 842.) Plaintiff's knee exhibited mild effusion, and he felt pain and stiffness on terminal flexion and extension. (*Id.*) Physician Assistant Lora Rancourt told Plaintiff to ice and elevate his knee and to take Ibuprofen three times a day. (*Id.*) She also submitted a referral for a hinged knee brace and an MRI. (*Id.*)

In October 2014, Plaintiff reported right hip and lower back pain and requested a referral to an orthopedist. (AR 727.) Plaintiff reported his pain was better with rest and he was not feeling tired or poorly and was not experiencing dizziness or lightheadedness. (*Id.*) Medical imaging of Plaintiff's hips from October 15, 2014 showed mid bilateral joint space narrowing but was otherwise normal. (AR 712.)

In November 2014, Plaintiff complained of lower back problems, which he dated back to a work-related injury in 1999. (AR 767.) Plaintiff characterized the pain as aching or throbbing and described numbness and tingling down the lower left extremities. (AR 838.) He reported he felt no pain relief when taking Ibuprofen. (*Id.*) Medical imaging of Plaintiff's spine showed mild to moderate disc height space loss and a slight straightening out of the normal lumbar lordoctic curve. (AR 770.) The image of Plaintiff's right hip revealed no abnormalities, good bone density, and good preservation of joint spaces. (*Id.*) PA Rancourt diagnosed Plaintiff with (1) degeneration of lumbar intervertebral disc, (2) osteoarthritis of the left knee, (3) sprain of medial collateral ligament of Plaintiff's left knee, and (4) a medial meniscus tear of Plaintiff's left knee. (AR 839.)

In January 2015, Plaintiff saw Dr. Tucker for health issues unrelated to the present case. (AR 683.) Dr. Tucker noted Plaintiff was not feeling tired or poorly and was not experiencing dizziness nor any lightheadedness. (*Id.*)

In March 2015, Plaintiff underwent a third consultative examination by Dr. Sabourin. (AR 809-21.) At this appointment, Plaintiff presented with a cane. (AR 816.) Plaintiff ambulated holding his left leg very straight while holding the cane in his right hand. (AR 817.) Plaintiff had somewhat of an awkward gait, but he was able to toe and heel walk. (*Id.*) Plaintiff felt his range of motion in his left knee was decreased voluntarily

and showed no gross instability nor crepitus in the left knee. (AR 819.) Plaintiff exhibited no difficulty getting on and off the examination table, and his range of motion of his spine and hips was grossly normal. (AR 818, 819.) Plaintiff exhibited normal motor strength in his upper and lower extremities and normal sensation. (AR 819.) Dr. Sabourin noted:

> This claimant comes in today with the severity and duration of his complaints disproportionate to the determinable condition. His x-rays of the left knee taken less than a year ago were remarkably normal with no mention of any arthritic changes . . . I feel he probably has had recent chondromalacic changes, but his exacerbation today was somewhat exaggerated. His low back problems appear to be not unusual for his age.

(AR 820.) Dr. Sabourin found Plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently. (AR 821.) He reported Plaintiff could stand, walk, and sit six hours of an eight-hour workday, and Plaintiff did not require an assistive device to ambulate. (*Id.*)

Medical imaging performed on December 21, 2015 showed evidence of mild to moderate degenerative changes of all knee compartments in both the left and right knee. (AR 1084.)

In 2016, Plaintiff underwent a series of injections to his left knee. (AR 1059-70.) He received at least five Supaz injections in his left knee and reported a twenty percent decrease in his pain level after the injections. (AR 1060.)

Plaintiff visited a provider in April 2016 for his continuing left and right knee pain. (AR 1074-75.) Plaintiff exhibited 5 out of 5 in quadricep and hamstring strength. (AR 1075.) The provider noted evidence of bursitis, a meniscus tear, a cartilage injury, and mild underlying degenerative changes in Plaintiff's right knee. (*Id.*) The provider also noted Plaintiff had osteoarthritis in the left knee. (*Id.*)

In May 2016, Plaintiff visited a medical provider for his right hip pain. (AR 1072.) Plaintiff characterized his pain as a dull aching, stabbing, and burning. (*Id.*) He reported his hip pain was aggravated by walking and prolonged standing, but the pain was relieved by medication. (*Id.*) Plaintiff exhibited a decreased range of motion in his right hip but 5

out of 5 hip flexion and abduction strength. (*Id.*) Medical imaging revealed evidence of trochanteric bursitis of the right hip with underlying degenerative changes of the hip. (AR 1073.) Plaintiff chose to proceed with cortisone injections in his hip, but he declined physical therapy due to transportation issues. (*Id.*)

At an appointment in September 2016, William Eves, MD, noted evidence of an articular cartilage injury with underlying degenerative changes in the left knee. (AR 1144.) Dr. Eves noted normal muscle tone, normal sensation, and normal motor strength and coordination. (*Id.*) Plaintiff denied any feelings of dizziness. (AR 1143.)

In 2016, Plaintiff underwent his third arthroscopy on his left knee. (AR 878.) In a follow-up appointment, Plaintiff reported he felt well without any significant complaints. (AR 1139.) During this exam, positive swelling and edema were apparent, as well as tenderness over the medial joint line and lateral joint line in Plaintiff's left knee. (AR 1142.) The medical provider noted positive knee crepitus and 5 out of 5 strength in Plaintiff's quadriceps and hamstrings. (*Id.*)

In 2017, Plaintiff began receiving additional injections in his left knee, noting about a twenty percent decrease in pain level after the injections. (AR 1126.) In April 2017, Plaintiff exhibited slight muscle atrophy, mild swelling, edema in his left knee, and mild tenderness. (AR 1134.). Plaintiff exhibited 5 out of 5 strength, normal muscle tone, normal sensation, and normal motor strength and coordination. (*Id.*)

Medical imaging performed in July 2017 showed mild to moderate degenerative changes of the medial compartment in both the left and right knee. (AR 1132.)

In September 2017, Plaintiff received his second Euflexxa intraarticular knee injection in his left knee. (AR 1126.) Plaintiff reported moderate to severe pain and characterized his pain as a 10 on a 0 to 10 scale. (*Id.*) Plaintiff exhibited normal sensation to light touch, normal coordination, and normal muscle tone. (*Id.*)

Plaintiff saw his treating provider, Tamara Tucker Ham, CFNP, in March 2018. (AR 1334.) At this appointment, Plaintiff denied feeling any symptoms of dizziness or lightheadedness and reported he was not feeling tired or poorly. (*Id.*)

In October 2018, Plaintiff complained of bone and chest pain. (AR 1343.) Plaintiff stated he was sweeping when his chest pain happened, but the pain abated with Ibuprofen. (*Id.*) Medical imaging showed no obvious joint space narrowing in Plaintiff's spine. (AR 1369.) Imagining of his left knee showed meniscus tearing. (*Id.*) His treatment provider recommended symptomatic care only, suggesting Plaintiff should continue with pain medication, anti-inflammatory medication, icing, and activity modification. (*Id.*)

## C.   Plaintiff's Testimony

On July 8, 2019, Plaintiff testified he is unable to work due to chronic pain. (AR 871-94.) Plaintiff reported he experiences pain in his left knee, right knee, right hip, and lower back. (AR 875, 877, 881, 882.)

Plaintiff's left knee pain began when he injured himself while working for EDCO Disposal Company in 2007. (AR 873-74.) Plaintiff testified he twisted his left knee while working, resulting in a torn meniscus. (*Id.*) After the injury in 2007, Plaintiff stated he underwent three knee surgeries on his left knee, with the most recent surgery occurring in 2016. (AR 878.) Plaintiff testified his left knee did not improve after the surgery in 2016, and he is unable to cover the financial costs of the injections recommended by his medical provider. (*Id.*) Plaintiff reported that a medical provider told him he needed a knee replacement in 2012 but that he was "too young." (AR 883.) Plaintiff stated he can sit with his left leg extended for fifteen to twenty minutes before he experiences pain. (AR 883-84.) He testified he can stand or walk for fifteen minutes before having to sit or change positions. (AR 884.) At the hearing, Plaintiff presented with a cane and testified he had been using the cane "the whole time." (AR 874-75.)

Plaintiff testified he experiences pain in his right hip because he favors his right side. (AR 877.) His right hip pain has intensified since he first applied in 2012, and the pain has not improved within the last three or four years. (AR 881-82.)

Plaintiff also testified he suffers from pain in his right knee, and that his medical providers found a meniscus tear in his right knee. (AR 882.) He reported he was unable to address the medical impairments in his right knee due to financial constraints. (*Id.*)

Plaintiff reported he takes Ibuprofen and Vicodin in order to manage his pain. (AR 875.) Although he takes this medication, he testified he is never completely pain free. (*Id.*) He reported the medication causes him to feel sleepy. (AR 884-85.) Due to the side effects of the medication, Plaintiff testified he has to lay down for approximately fifteen minutes after he takes his medication, three to four times a day. (*Id.*)

In 2015, Plaintiff was able to perform some household chores. (AR 886-87.) He was able to clean the yard, take care of his dogs, water the plants, clean the dishes, and vacuum. (*Id.*) Plaintiff reported he was able to carry ten or fifteen pounds in 2015. (AR 887.) However, at the 2019 hearing, Plaintiff testified he was no longer able to do these things because he loses balance. (AR 886.)

**D.    ALJ's Findings**

The ALJ found Plaintiff met the insured status requirements of the Social Security Act through March 31, 2015. (AR 853.) At step one of the sequential evaluation described above, the ALJ found Plaintiff had not engaged in substantial gainful activity since September 13, 2007, the alleged onset date. (*Id.*)

At step two, the ALJ found severe impairments of chondromalacia and medial femoral condyle with early degenerative changes of the left knee; status-post left knee arthroscopies; mild thoracic spondylosis with mild levoscoliosis; lumbar degenerative disc disease, with mild facet arthritis at L5-S1; trochanteric bursitis and degenerative changes of the right hip; and degenerative changes of the right knee. (*Id.*) Additionally, at step two, the ALJ found Plaintiff's impairments of hypertension, glaucoma, diabetes mellitus and obesity do not have more than a minimal effect on his capacity to work. (AR 853-54.) Finally, at step two, the ALJ found Plaintiff's alleged medication-induced dizziness and sleepiness were non-medically determinable impairments. (AR 854.)

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

In the ALJ's RFC assessment between steps three and four, the ALJ found Plaintiff could perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) meaning the claimant could lift and/or carry twenty pounds occasionally and ten pounds frequently; sit, stand, and/or walk for six hours in an eight-hour workday; occasionally climb, kneel, and crouch; and frequently stoop. (*Id.*)

At step four, the ALJ found Plaintiff is capable of performing past relevant work as a security guard and therefore terminated the analysis at that step. (AR 860.)

### III.   STANDARD OF REVIEW

A reviewing court will disturb the Commissioner's denial of benefits "only if it is not supported by substantial evidence or is based on legal error." *Brawner v. Sec'y of Health and Human Servs.*, 830 F.2d 432, 433 (9th Cir. 1988). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Coleman v. Saul*, 979 F.3d 751, 755 (9th Cir. 2020) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews*, 53 F.3d at 1039. If the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

### IV.   DISCUSSION

Plaintiff challenges the ALJ's decision on the grounds that the ALJ impermissibly rejected Plaintiff's subjective symptom testimony and failed to evaluate his limitations based on his subjective experiences of pain.

### A.   The ALJ Articulated Clear and Convincing Reasons to Reject Plaintiff's Subjective Symptom Testimony

#### 1.   Applicable Law

An ALJ cannot be required to believe every allegation, or else benefits would be available for the asking, which would be contrary to 42 U.S.C. § 423(d)(5)(A). *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Congress explicitly prohibits granting benefits

based solely on subjective complaints. 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability."); *see also* 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain will not alone establish that you are disabled.").

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). The ALJ must first "determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). If the claimant satisfies this requirement and there is no evidence of malingering, the ALJ is permitted to reject the claimant's testimony only if the ALJ "makes specific findings stating clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1283-84 (9th Cir. 1996). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Id.*

When evaluating the claimant's credibility[4] regarding allegations of pain, the ALJ may consider the following factors: daily activities; nature, location, onset, duration, frequency, radiation, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of medication; treatment other than medication; and functional restrictions. *Bunnell*, 947 F.2d at 346 (quoting SSR 88-13, 1988 LEXIS 14, *7-8).

---

[4] The Court is aware the Social Security Administration eliminated the term "credibility" regarding evaluation of a claimant's allegations of pain. The new standard under SSR 16-3p is whether the claimant's testimony is consistent with the objective medical evidence and other evidence in the individual's record. SSR 16-3p, 2016 LEXIS 4, *1-3. Here, the ALJ found Plaintiff's testimony was not consistent with the objective medical evidence contained in the record. (AR 857.)

### 2.   Discussion

In the first step of the two-step analysis, the ALJ found "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 855.) The ALJ made no mention of malingering. Therefore, it is this Court's task to determine whether the ALJ's findings concerning the intensity, persistence, and limiting effects of Plaintiff's pain is supported by substantial evidence under the clear and convincing standard. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008).

Although lack of medical evidence may not solely form the basis for discounting complaints of pain, the ALJ may consider it as a factor in his credibility analysis. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (holding the ALJ properly considered x-rays which showed no disc herniation or nerve root impingement). Here, the ALJ concluded that although Plaintiff complained of limitations due to pain, there is little in the record to support the severity and limiting effects of his symptoms and allegations. (AR 858.) Moreover, the medical record affirmatively contradicted Plaintiff's claims.

At the 2019 hearing, Plaintiff testified to continued cane usage due to pain in his left knee. (AR 875.) However, the ALJ reviewed the medical record and found medical providers rarely reported that Plaintiff needed a cane to ambulate. (AR 857.) Additionally, the ALJ gave great weight to Dr. Sabourin's consultative exams regarding Plaintiff's need for an assistive device to ambulate.[5] (*Id.*) Dr. Sabourin performed three consultative exams in 2010, 2013, and 2015. (AR 456, 624, 816.) Dr. Sabourin opined in all three exams that Plaintiff performed a normal toe to heel walk, had the ability to get on and off the examination table, and did not need an assistive device to ambulate. (AR 457-59, 625, 628, 818-19, 821.) The ALJ gave great weight to the portion of Dr. Sabourin's opinion noting no need for an assistive device because providers rarely noted a need for a cane, Plaintiff only appeared at one examination with a cane, and Plaintiff exhibited a normal toe and heel

---

[5] Plaintiff does not challenge the ALJ's assignment of weight to Dr. Sabourin's opinion.

walk and the ability to get on and off the table. (AR 858.)[6] The ALJ provided clear and convincing reasons, supported by substantial evidence, when he found Plaintiff's subjective testimony regarding cane usage was not supported by the objective medical evidence.

Additionally, the ALJ found Plaintiff's testimony of limitations due to pain inconsistent with the medical evidence in the record. For example, Plaintiff testified his pain medication caused him to feel sleepy and lightheaded, and he is forced to lie down three to four times a day for approximately fifteen to twenty minutes. (AR 884-85.) However, the ALJ noted Plaintiff routinely denied medication side effects and reported no dizziness or sleepiness to providers. (AR 854.) For example, in 2010, Plaintiff's medical provider wrote: "Side effects of the medication were discussed with the patient, which the patient is not experiencing." (AR 578.) At other exams in 2014, 2016, and 2018, Plaintiff denied any dizziness or lightheadedness and reported he was not feeling tired or poorly. (AR 727, 1262, 1334.) Further, the ALJ found providers did not note a need to lie down. (AR 858.) In 2011, at two different examinations, Dr. Harris's treatment plans did not include a need to lie down. (AR 445, 590.) At a 2016 examination, Steven Tradonsky, MD, reported Plaintiff should continue with symptomatic care only, which included pain medication, anti-inflammatories, icing and activity modification—not a need to lie down. (AR 1368.) Based on this evidence, the ALJ's conclusion that Plaintiff's testimony regarding medication side-effects was not consistent with the medical evidence was supported by substantial evidence.

Based on the foregoing, the ALJ offered clear and convincing reasons, supported by substantial evidence, when determining the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the

---

[6] Plaintiff argues his treating physician, Dr. Hall, prescribed him a cane. The ALJ addressed Dr. Hall's opinion in his decision and ultimately rejected the opinion. Plaintiff did not challenge the ALJ's decision to discredit a treating physician's opinion.

medical evidence and the overall record. Although the medical evidence does illustrate Plaintiff suffers from some medical impairments, the ALJ's interpretation of the evidence was rational and must be upheld.

Plaintiff selectively picks certain record cites in the ALJ's decision to contend the ALJ did not provide clear and convincing reasons for rejecting his testimony about the severity of his symptoms. (Pl.'s Mot. at 7:18-8:16.) Plaintiff argues these medical records do not support the ALJ's limitation of light work. (*Id.*) Plaintiff also argues that these few record citations show the ALJ ignored evidence supporting Plaintiff's complaints and limitations. (Pl.'s Mot. at 8:21-22.) The Court finds these arguments unpersuasive. The ALJ did not deny Plaintiff exhibited medical impairments nor did the ALJ ignore evidence supporting Plaintiff's complaints. In fact, the ALJ acknowledged Plaintiff exhibited certain medical symptoms, such as tenderness, crepitus, a reduced range of motion to the knees, and a slightly antalgic gait and that medical imaging showed degenerative changes to Plaintiff's knees, right hip, thoracic spine, and lumbar spine with three left knee surgeries. (AR 856-57.) Despite these impairments, the ALJ concluded Plaintiff's testimony was not consistent with the multiple objective medical findings of normal sensation, full or nearly full strength to the lower extremities, little to no reports of assistive device use, normal coordination and musculoskeletal findings, and non-disabling physical examination reports. (AR 858.)

**B.     The ALJ's Treatment of Plaintiff's Daily Activities**

Plaintiff further argues the ALJ improperly concluded Plaintiff's daily activities were inconsistent with his testimony and that these activities supported a limitation to light work. (Pl.'s Mot. at 9:9-10:9.) It is well established that the ALJ may consider Plaintiff's daily activities as a factor when considering Plaintiff's subjective testimony. *Burch*, 400 F.3d at 681; *Bunnell*, 947 F.2d at 346 ("SSR 88-13 lists a number of factors an adjudicator must consider to determine the credibility of the claimant's allegations of disabling pain. . . . [This includes] daily activities."). "[I]f a claimant is able to spend a substantial part of his day engaged in pursuits that are transferable to a work setting, a specific finding

21

as to this fact may be sufficient to discredit the allegation of disabling excess pain." *Fair*, 885 F.2d at 603. However, the Ninth Circuit has warned that "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). Further, claimants need not be completely incapacitated in order to be eligible for social security benefits. *Fair*, 885 F.2d at 603.

The ALJ considered Plaintiff's daily activities when analyzing whether the record supported the intensity, persistence, and limiting effect of Plaintiff's symptoms and allegations. (AR 857-58.) Specifically, the ALJ noted that "[t]he claimant reported playing with his dog, lifting ten-pound plants in 2017, going on walks, and 80 to 90 percent pain relief with ibuprofen. He reported that he could clean the yard, take care his dogs, water plants, clean dishes, vacuum, and lift 10 to 15 pounds in 2015." (AR 857.)

Although the ALJ is permitted to consider Plaintiff's activities, the ALJ failed to explain how these activities contradicted Plaintiff's testimony. The ALJ did not identify any evidence in the record that indicates Plaintiff did any of these activities for a substantial part of his day. In fact, Plaintiff testified he could no longer perform many of these activities due to his fear of losing balance. (AR 886.)

Nor did the ALJ explain how Plaintiff's daily activities of playing with dogs, watering plants, cleaning dishes, vacuuming, and lifting ten-to-fifteen-pound plants are transferable to Plaintiff's job as a security guard. *Fair*, 885 F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to rest or take medication.") Even Plaintiff's ability to complete strenuous work, such as cleaning the yard and lifting ten-pound plants in 2017, does not undermine his testimony regarding his limitations. *See Meir v. Astrue*, 404 F. App'x 150, 152 (9th Cir. 2010) (finding the ALJ erred when rejecting a claimant's testimony even where claimant "occasionally engage[d] in more strenuous activities such as lifting bags of salt and garbage and shoveling snow" because the activities were

performed sporadically). The ALJ failed to point to any evidence in the record illustrating Plaintiff completed these strenuous tasks more than sporadically.

For these reasons, the ALJ erred when concluding Plaintiff's daily activities support a limitation to light work. Nonetheless, in light of the objective medical evidence on which the ALJ relied, there was substantial evidence supporting the ALJ's overall decision. Not only was there a lack of medical evidence to support Plaintiff's subjective testimony, but the medical evidence also actively refuted his testimony. Thus, any error in discussing Plaintiff's daily activities was harmless.

## C.    Plaintiff is not Entitled to Summary Judgment

In addition to Plaintiff's summary judgment motion, Defendant's cross-motion for summary judgment is pending before the Court. Defendant contends the ALJ's RFC was supported by substantial evidence and the ALJ articulated clear and convincing reasons for rejecting Plaintiff's subjective testimony.

As discussed above, the ALJ considered all of Plaintiff's symptoms and supported his RFC determination with substantial evidence from the medical record. The ALJ properly discredited Plaintiff's credibility due to inconsistencies with his allegations of disability and the objective medical evidence. Accordingly, this Court DENIES Plaintiff's MSJ and GRANTS Defendant's Cross-MSJ.

## IV.    CONCLUSION

Based on the foregoing, Plaintiff's MSJ is DENIED and Defendant's Cross-MSJ is GRANTED. The Clerk of Court is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

DATED: March 22, 2021

Hon. William V. Gallo
United States Magistrate Judge

19-CV-2373-WVG